IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ANDRE DARNELL THOMAS, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) Case No. 16-CV-308-JED-JFJ |
| SCOTT CROW, Interim Director,[1] | ) |
| | ) |
| Respondent. | ) |

## OPINION AND ORDER

Before the Court is Andre Darnell Thomas' 28 U.S.C. § 2254 habeas corpus petition (Doc. 1). Thomas challenges his first-degree murder conviction in Tulsa County District Court, Case No. CF-2013-2712. For the reasons below, the Court will deny the petition.

**I. Background**

This case stems from a fatal shooting at the River Glen Apartments in south Tulsa. (Doc. 8-2 at 1-2).[2] On the evening of May 24, 2013, Thomas and several young men went out to a nightclub. (*Id.*; *see also* Doc. 9-6 at 81-82). The group included Cortellieus Lee, Rolando Stevenson, and victim Ronald Harris. (*Id.*). According to Lee, Thomas stated he was "fixing to kill" Harris. (Doc. 9-6 at 86). Lee purportedly urged Thomas to just fight Harris, but Thomas replied "No." (*Id.*). After the nightclub closed, the group congregated in the River Glen Apartments' courtyard. (Doc. 8-2 at 1; *see also* Doc. 9-6 at 90, 93). Stevenson, who also testified

---

[1]  Petitioner is incarcerated at the Cimarron Correctional Facility (CCF), a private prison in Cushing, Oklahoma. (Doc. 1 at 1). Scott Crow, Interim Director of the Oklahoma Department of Corrections, is therefore substituted in place of Janet Dowling as party respondent. *See* Habeas Corpus Rule 2(a). The Clerk of Court shall note the substitution on the record.

[2]  The Court finds the summary opinion issued by the Oklahoma Court of Criminal Appeals (Doc. 8-2) accurately sets forth certain noncontroversial background facts.

at trial, noticed Thomas pulling people to the side and whispering about something. (Doc. 9-6 at 28). Later that night, Stevenson purportedly witnessed Thomas shoot Harris in the back of the head. (*Id.* at 30-33). Lee also testified he heard the gunshot, saw "fire" from a gun in Thomas' hand, and observed Thomas running away. (*Id.* at 95-96). Stevenson and Lee initially refused to cooperate with police, but they later named Thomas as the gunman. (Doc. 8-2 at 1). Thomas was arrested and interviewed, but he denied any involvement in Harris' death. (*Id.* at 2).

The State charged Thomas with first-degree murder (Count 1). (Doc. 9-10 at 21). His jury trial commenced on June 9, 2014. (Doc. 9-4). The State theorized that Thomas shot Harris in retaliation for some earlier disagreement, but the precise motive was never clear. (Doc. 8-2 at 2). After a four-day trial, the jury convicted Thomas of the murder charge and recommended a sentence of life imprisonment without the possibility of parole. (Doc. 9-7 at 206). The state court sentenced him accordingly. (Doc. 9-9 at 4).

Thomas perfected a direct appeal to the Oklahoma Court of Criminal Appeals (OCCA). By a summary opinion entered August 19, 2015, the OCCA affirmed the conviction and sentence. (Doc. 8-2). Thomas filed the instant § 2254 petition (Doc. 1) on May 25, 2016. He identifies three grounds of error, which are taken from his OCCA brief:

(Ground 1):   Various instances of prosecutorial misconduct undermined Thomas' due process rights.

(Ground 2):   The state court erred by admitting a gruesome photo of the deceased victim.

(Ground 3):   Thomas' post-arrest statements to law enforcement were involuntary.

(Doc. 1 at 4, 7, 8; *see also* Doc. 8-1 at 2-3).

Respondent filed an answer (Doc. 8), along with relevant portions of the state court record (Doc. 9), on August 1, 2016. Respondent concedes, and the Court finds, that the Petition is timely

and Thomas exhausted his state remedies. *See* 28 U.S.C. §§ 2244(d)(1); 2254(b)(1)(A). However, Respondent argues the claims fail on the merits. The matter is fully briefed and ready for review.

## II. Discussion

The Antiterrorism and Effective Death Penalty Act (AEDPA) governs this Court's review of petitioner's habeas claims. *See* 28 U.S.C. § 2254. Relief is only available under the AEDPA where the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Further, because the OCCA already adjudicated petitioner's claims, this Court may not grant habeas relief unless he demonstrates that the OCCA's ruling: (1) "resulted in a decision that was contrary to . . . clearly established Federal law as determined by Supreme Court of the United States," 28 U.S.C. § 2254(d)(1);[3] (2) "resulted in a decision that . . . involved an unreasonable application of clearly established Federal law," *id.*; or (3) "resulted in a decision that was based on an unreasonable determination of the facts" in light of the record presented to the state court, *id.* at § 2254(d)(2).

"To determine whether a particular decision is 'contrary to' then-established law, a federal court must consider whether the decision 'applies a rule that contradicts [such] law' and how the decision 'confronts [the] set of facts' that were before the state court." *Cullen v. Pinholster,* 563 U.S. 170, 182 (2011) (alterations in original) (quotations omitted). When the state court's decision "identifies the correct governing legal principle in existence at the time, a federal court must assess

---

[3] As used in § 2254(d)(1), the phrase "clearly established Federal law" means "the governing legal principle or principles" stated in "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)); *see also House v. Hatch*, 527 F.3d 1010, 1015 (10th Cir. 2008) (explaining that "Supreme Court holdings—the exclusive touchstone for clearly established federal law—must be construed narrowly and consist only of something akin to on-point holdings").

whether the decision 'unreasonably applies that principle to the facts of the prisoner's case." *Id.* (quotations omitted). Significantly, an "unreasonable application of" clearly established federal law under § 2254(d)(1) "must be objectively unreasonable, not merely wrong." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quotations omitted). "[E]ven clear error will not suffice." *Id.* Likewise, under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). The Court must presume the correctness of the OCCA's factual findings unless petitioner rebuts that presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Essentially, the standards set forth in § 2254 are designed to be "difficult to meet," *Harrington v. Richter,* 562 U.S. 86, 102 (2011), and require federal habeas courts to give state court decisions the "benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). A state prisoner ultimately "must show that the state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

**A. Prosecutorial Misconduct (Ground 1)**

Thomas first contends the prosecutor's remarks during voir dire, redirect-examination, and closing argument deprived him of a fair trial. (Doc. 1 at 4; *see also* Doc. 8-1 at 2-3). The prosecutor stated that motive is not an element of the crime; analogized motive to a missing puzzle piece; inquired about whether defense counsel sought DNA testing; garnered sympathy for an eyewitness; and described a defense verdict as an injustice. (Doc. 8-1 at 3). The OCCA concluded "none of the prosecutor's comments … denied [Thomas] a fair trial." (Doc. 8-2 at 9).

4

Prosecutorial misconduct implicates the Due Process Clause of the Fourteenth Amendment. However, "inappropriate prosecutorial comments, standing alone," are not sufficient to vacate "a criminal conviction obtained in an otherwise fair proceeding.'" *Matthews v. Workman*, 577 F.3d 1175, 1186 (10th Cir. 2009) (quoting *United States v. Young*, 470 U.S. 1, 11 (1985)). "The errant remarks must have so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Cuesta-Rodriguez v. Carpenter*, 916 F.3d 885 (10th Cir. 2019) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). To determine whether the challenged remarks deprived the petitioner of a fair trial, courts must consider "all the surrounding circumstances, including the strength of the state's case" and any cautionary instructions to the jury. *Hamilton v. Mullin*, 436 F.3d 1181, 1187 (10th Cir. 2006). Applying this standard, the Court will analyze each challenged remark below.

### 1. *Comments During Voir Dire*

During voir dire, the prosecutor explained to a juror: "the elements of the crime of Murder … don't include motive," and motive is "not something the State of Oklahoma has to prove beyond a reasonable doubt." (Doc. 9-5 at 76). The juror responded: "I think motive probably has some play in it. But … if you prove to me it was [murder], my verdict will be guilty regardless of what the reason is." (*Id.* at 76-78). The prosecutor went on to ask the next prospective juror about the motive issue; the juror initially responded that the State should have to prove motive. (*Id.* at 78). However, the juror then agreed to "follow his oath" if the State proved its case without establishing a motive. (*Id.* at 79). Later, when speaking with two other jurors, the prosecutor compared motive to a missing piece in a jigsaw puzzle. (*Id.* at 92, 120). He asked: "Now when we're putting together the puzzle, … if you don't have a couple pieces in that puzzle [*i.e.,* motive], sometimes if there's

5

enough pieces, are you able to see what happened?" (*Id.* at 92). One juror agreed he could, "depending on the gravity of those missing pieces." (*Id.* at 93). Another juror stated she "should have all the pieces," but conceded she could convict a defendant if the State proves each element of the crime. (*Id.* at 121-122).

Thomas argues the questions about motive violated OKLA. DIST. CT. R. 6, which prohibits hypothetical stake-out questions about how jurors would decide the law or facts. He also argues the jigsaw puzzle analogy diluted the reasonable doubt standard. The OCCA disagreed, finding: "Rule 6 is not violated when counsel merely points out that as a matter of law, certain factors generally require a certain result." (Doc. 8-2 at 7). The OCCA further found the prosecutor did not prohibit jurors from considering motive, but "merely made sure the[y] … understand that a conviction could be had without any particular motive being identified." (*Id.*). As to the puzzle analogy, the OCCA found it did not conflict with the various reminders and instructions regarding the State's burden of proof. (*Id.*).

This ruling is consistent with the record and federal law. "Voir dire examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges." *Gardner v. Galectka*, 568 F.3d 862, 890 (10th Cir. 2009) (quotations omitted). "Potential jurors, however, are not expected to be totally ignorant of the facts surrounding the case." *Goss v. Nelson*, 439 F.3d 621, 627, 634 (10th Cir. 2006). Constitutional standards are met if the jury "can lay aside any preconceived opinions regarding the outcome of the case and render a verdict based on the evidence presented in court." *Id.* The verdict here is clearly based on the evidence, notwithstanding any voir dire questions about motive. Two eyewitnesses saw Thomas shoot the victim, and one testified Thomas promised to kill the victim earlier that night.

(Doc. 9-6 at 31-32; 86; 96). There is also no indication that the prosecutor's remarks caused any juror to overcome their doubts based on apparent the lack of motive. The state court explained the burden of proof multiple times, and the jury received detailed instructions on the standard of proof. (Doc. 9-10 at 152). Therefore, the prosecutor's comments during voir dire did not render the trial fundamentally unfair.

### 2. *Questions Regarding Evidence*

Thomas also alleges the prosecutor attempted to shift the burden of proof during trial. After defense counsel confirmed a police witness did not test DNA evidence on cigarette butts near the victim's body, the prosecutor asked the detective: "Who can request these items to be tested?" (Doc. 9-7 at 52, 68). The detective indicated any party can request DNA testing, including "the attorneys representing the defendant." (*Id.* at 69). The state court struck the comment and explained:

> Strike it and tell the jury to disregard the comments, the answer and the question. The reason I tell you that is because, as I've told you already … the burden of proof is on the State of Oklahoma. … The burden of proof never shifts to the Defense, and it never places upon the Defense any burden to investigate or take upon themselves the obligation to demonstrate proof in this case.

(*Id.*). Based on this admonition, the OCCA found no constitutional defects. (Doc. 8-2 at 8). The OCCA noted that "comments on the defendant's equal access to physical evidence are permissible," and "in any event, the … admonition cured even the remotest potential for error." (*Id.*).

Having reviewed the transcripts, the Court agrees. Like Oklahoma, federal law generally allows prosecutors to comment on the "defendant's failure to call certain witnesses or present certain testimony." *Battenfield v. Gibson,* 236 F.3d 1215, 1225 (10th Cir. 2001); *see also United*

7

States v. Simpson, 7 F.3d 186, 190 (10th Cir. 1993). The exchange was also fairly innocuous compared to the evidence of guilt, and the admonition regarding the burden of proof was very thorough. Consequently, the question regarding DNA evidence did not render the trial unfair.

### 3. *Comments During Closing Argument*

Next, Thomas challenges various comments by the prosecutor during closing argument. The challenged comments are listed, in context, as follows:

(i) Defense counsel remarked that "every time she opens the newspaper there's a murder." The prosecutor responded: "victims have equal rights, too … There's a lot of people out there just like [the victim]… that doesn't mean that we let the murders go." (Doc. 9-7 at 154).

(ii) Defense counsel argued Lee, an eyewitness, lied about being afraid to testify, asking: "If you're scared, why do you keep offering up this information?" The prosecutor then suggested Lee was "terrified" and likely developed post-traumatic stress disorder from the ordeal:

> [H]e saw [Thomas] kill an innocent man…. He saw Ronald Harris in a pool of his own blood. Blood gushing out of his head. He knelt down and shook him. And he's never going to get that out of the back of his mind. He was terrified out of his mind.

(*Id.* at 131, 172).

(iii) Defense counsel concluded closing argument by stating: "a great possibility of injustice can occur here." The prosecutor started his argument by stating: "I agree, a great injustice could be done this week… If you disregard" the eyewitness testimony and other evidence, "that would be a great injustice." (*Id.* at 143-144).

The OCCA considered these comments and found no misconduct or improper appeal to emotion. (Doc. 8-2 at 9). According to the OCCA, the comments were either invited or based on the evidence at trial. (*Id.*). The Court agrees each challenged remark was, to some degree, invited

8

by defense counsel. This is particularly true regarding the "injustice" and "victim's rights" comments described in paragraphs (i) and (iii). *See Cuesta-Rodriguez v. Carpenter,* 916 F.3d 885, 908 (10th Cir. 2019) ("[I]n evaluating prosecution comments' impact, [habeas courts] consider whether the defense invited the comments"). Further, the comments about Lee were based on his demeanor at trial, and in response to defense counsel's detailed argument that Lee was lying and/or likely the guilty party. *See Romero v. Franklin*, 243 Fed. App'x 420, 421–22 (10th Cir. 2007) (finding no prosecutorial misconduct where "colorful" analogy "was a reasonable inference based on the evidence").

In sum, the prosecutor's comments, individually and taken together, did not render the trial fundamentally unfair or otherwise violate Thomas' due process rights. Ground 1 therefore fails.

**B. Crime Scene Photo (Ground 2)**

Thomas next argues the state court improperly admitted a photograph of the victim's head, lying face down, "with what appears to be brain matter flowing from the ear." (Doc. 1; *see also* Doc. 8-1 at 12). He contends the photograph was highly prejudicial and showed only the result of the injury, rather than the manner of death. In rejecting Ground 2, the OCCA found the photograph "show[ed] the manner and direct effects of … the homicidal act." (Doc. 8-2 at 3). Because "gruesome crimes make for gruesome crime-scene photographs," the OCCA concluded the probative value of the evidence outweighed its prejudicial effect. (*Id.*). A footnote in the Summary Opinion also clarifies the OCCA was unable to discern any brain matter in the photograph. (*Id.* at 3, n. 1).

"Federal habeas review is not available to correct state law evidentiary errors; rather it is limited to violations of constitutional rights." *Spears v. Mullin*, 343 F.3d 1215, 1225 (10th Cir.

2003). "When, as here, habeas petitioners challenge the admission of photographic evidence as violative of the Constitution, [the Court] considers whether the admission of evidence so infected the trial with unfairness as to [violate] due process." *Id.* at 1226 (quotations omitted); *see also Smallwood v. Gibson*, 191 F.3d 1257, 1275 (10th Cir. 1999) ("The essence of our inquiry ... is whether the admission of the photographs rendered the proceedings fundamentally unfair.").

The Tenth Circuit has rejected fundamental-unfairness arguments where: (1) the photograph supports the testimony by the medical examiner; and (2) the evidence of guilt is strong. *See Wilson v. Sirmons*, 536 F.3d 1064, 1115 (10th Cir. 2008) ("The photographs, while gruesome … allowed the examiner to show where the baseball bat caused various injuries," and in any event, the "evidence at the guilt phase was particularly strong"); *Thornburg v. Mullin*, 422 F.3d 1113, 1129 (10th Cir. 2005) (denying habeas relief where photographs corroborated witness accounts and there was strong evidence of guilt); *Smallwood v. Gibson*, 191 F.3d 1257, 1275 (10th Cir. 1999) (same). Here, the State presented strong, direct evidence of guilt, and two trial witnesses relied on the challenged photograph to identify the victim. (Doc. 9-6 at 169; *see also* Doc. 9-7 at 10). Further, as the OCCA pointed out, the photograph supports the medical examiner's testimony that the bullet remained lodged in the victim's skull. (Doc. 8-2 at 3, n. 1; *see also* Doc. 9-6 at 163).

On this record, the Court cannot conclude the photograph rendered the trial fundamentally unfair. Habeas relief is unavailable on Ground 2.

**C. Involuntary Statements to Police (Ground 3)**

Thomas finally argues the state court erred in admitting his recorded police interview. (Doc. 1; *see also* Doc. 8-1 at 17). Although Thomas never admitted guilt, the video demonstrates how he amended his description of the evening in question. (Doc. 8-2 at 3-6, n. 2). Thomas contends

detectives did not issue a proper *Miranda*[4] warning and denied his requests for an attorney. (*Id.*). After reviewing the video, the OCCA found Thomas' statements were voluntary. (Doc. 8-2 at 3-6).

The Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend V. Accordingly, the "prosecution may not use statements … from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 445 (1966). A defendant may invoke his right to remain silent or his right to counsel prior to or during an interrogation. *Miranda,* 384 U.S. at 472-474. The interrogation must then cease, "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 485 (1981). After reinitiating contact, a defendant must waive his rights under *Miranda*, and the waiver must be voluntary, knowing, and intelligent. *Edwards*, 451 U.S. at 484-485.

The entire interview here was recorded. The video reflects that Detective White and Officer Ritter introduced themselves and asked for background information including his name, contact information, familial relationships, education level, and tattoos. (Conventionally filed CD recording of police interview at 13:33:00 - 13:37:28).[5] The OCCA found, and the Court agrees, that these questions did not amount to interrogation. (Doc. 8-2 at 4). Law enforcement officials are permitted to ask for basic biographical questions without issuing a *Miranda* warning. *See*

---

[4]     *Miranda v. Arizona*, 384 U.S. 436 (1966).
[5]     Hereinafter, the Court will refer to the exhibit as "CD." The numbers that follow refer to the timestamp from the video recording.

*Rhode Island v. Innis*, 446 U.S. 291, 303 (1980). After these initial questions, the officers and Thomas engaged in the following exchange:

> DETECTIVE WHITE: I am going to read you your rights and I would like to talk with you. You can answer what you want, you don't have to answer what you don't, alright?
>
> THOMAS: Because I am under arrest?
>
> DETECTIVE WHITE: Yes.
>
> THOMAS: For what?
>
> DETECTIVE WHITE: For murder. Yeah. Yes, I mean it's up to you, if you want to tell me your story.
>
> THOMAS: I don't have a story. Murder for who? What?
>
> OFFICER RITTER: That's what he wants, he needs to get your side of the story, but he can't talk to you about it until he reads you your rights.
>
> DETECTIVE WHITE: Yeah.
>
> OFFICER RITTER: We're more than willing to talk to you and listen to your side. If you had anything to do with it, then he wants to hear that.
>
> DETECTIVE WHITE: This is your opportunity to tell me you had nothing to do with it.
>
> THOMAS: But I am going to jail for it. Could I have a lawyer or something because I don't have nothing to do with no murder.
>
> DETECTIVE WHITE: That's up to you. But you are going to jail for murder today, so yeah.

(CD at 13:30:32 - 13:38:18).

The video reflects that Detective White then turned his head from Thomas towards the table and began writing some notes. He then showed Thomas a picture and continued:

> DETECTIVE WHITE: Are you related to this guy?
>
> THOMAS: Yeah.

DETECTIVE WHITE: Who's that?

THOMAS: Uhh, Nick Cortez.

DETECTIVE WHITE: How are you related to him?

THOMAS: He's just my cousin, I don't know.

DETECTIVE WHITE: Do you want to talk to me or not?

THOMAS: Uh, No. I need a lawyer. I don't know what's going on.

DETECTIVE WHITE: Well, you're going to jail for murder, but that's your right, you don't have to talk with me, okay?

(CD at 13:38:22 - 13:38:48).

Detective White again turned his head from Thomas towards the table and began writing some notes. After a 12-13 second pause, Thomas continued as follows:

THOMAS: Who said I murdered somebody?

DETECTIVE WHITE: A lot of people that were there.

THOMAS: What the f**k? [Pause]. A lot of people that said, that was there?

DETECTIVE WHITE: Dude, I'd love to hear the story. I'm mean, you've already, you don't want to talk to me about it.

THOMAS: But I'm saying, without a lawyer I'm going to jail anyway. What am I, I mean, I don't understand.

OFFICER RITTER: What do you not understand?

THOMAS: I'm going to jail anyway; I'm going to talk to you all about what, that's not going to stop me from going to jail. I don't have nothing to do with no murder. What, I mean, you all not telling me nothing; you're not telling me who told you I murdered somebody; who did I murder, when did I …

OFFICER RITTER: [Interrupts] We can't talk to you about it unless you agree to talk to us. And like he said, you can stop answering questions whenever you want.

THOMAS: Okay.

13

OFFICER RITTER: If you get to a point where you don't want to answer questions, you can stop.

THOMAS: Alright.

OFFICER RITTER: But we can't talk to you about anything until you waive. Man, that sheet is just saying that you'll talk to us without your lawyer here, and you can stop answering questions at any time.

DETECTIVE WHITE: But it's on you. We can talk about how the color of the sky is blue, but it's up to you what you want to talk to [us about], if that's what you want to do, that's fine.

THOMAS: Okay.

DETECTIVE WHITE: Do you want to talk?

THOMAS: Yeah, I'm going to talk, because I don't …

DETECTIVE WHITE: Well, but it's up to you, you understand this?

THOMAS: Yeah.

(CD at 13:39:00 - 13:40:15). At this point, Detective White issued a full *Miranda* warning. Thomas indicated he understood each component of the warning and confirmed it was his personal decision to talk with the police. (CD at 13:40:16 – 13:41:01).

The OCCA determined the first question, "Could I have a lawyer or something, because I don't have nothing to do with no murder?" was a request for more information, not an unequivocal request for counsel. (Doc. 8-2 at 5). Having carefully reviewed the record and applicable law, this ruling is not "objectively unreasonable." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014). Federal law requires the request for counsel to be "clear and unequivocal." *Davis v. United States*, 512 U.S. 452, 459 (1994). An "equivocal" reference to an attorney, which leads a reasonable officer to understand the defendant "*might* be invoking the right to counsel," does not require police to cease

14

questioning. *Id.* (emphasis in original). Statements like "maybe I should talk to an attorney;" "I might want to talk to my attorney;" or "do I need an attorney" are considered ambiguous. *Id.* at 462; *see also United States v. Zamora*, 222 F.3d 756, 765 (10th Cir. 2000); *Mitchell v. Gibson*, 262 F.3d 1036, 1056 (10th Cir. 2001). Thomas' request for an "attorney or something," followed by more conversation, is arguably equivocal under this precedent.

The OCCA further found that detectives ceased the interrogation once Thomas definitely stated "I need a lawyer," and that Thomas reinitiated conversation by asking "Who said I murdered somebody." (*Id.* at 6). The Court agrees. An accused can reinitiate conversation by "evidenc[ing] a willingness and a desire for a generalized discussion about the investigation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46 (1983). Thomas asked about his accusers 12-13 seconds after Detective White ceased eye-contact and returned to his paperwork. The video reflects that Thomas then repeatedly, explicated waived his previous request for a lawyer, and the officers issued a complete *Miranda* warning. (CD at 13:39:00 - 13:41:01). On this record, the Court cannot find Thomas' statements were involuntary, or that the state court improperly admitted his recorded interview with police. Ground 3 therefore fails.

Based on the foregoing, the Court concludes Thomas' conviction does not violate federal law. 28 U.S.C. § 2254(a), and the Petition must be denied.

## III. Certificate of Appealability

Habeas Corpus Rule 11 requires "[t]he district court [to] . . . issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate may only issue "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When the district court rejects the merits of petitioner's constitutional claims, he must

make this showing by "demonstrat[ing] that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons discussed above, Thomas has not made the requisite showing on any of his claims. The Court therefore denies a certificate of appealability.

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1. The Clerk of Court shall note the substitution of Scott Crow, Interim Director, in place of Janet Dowling, as party respondent.

2. The petition for a writ of habeas corpus (Doc. 1) is denied.

3. A certificate of appealability is denied.

4. A separate judgment will be entered herewith.

ORDERED this 17th day of September, 2019.

JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT